CcdQwilC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     JIMMY WILLIAMS
3

4                    Plaintiff

5            v.                          11 CV 5202 (JGK)

6    THE CITY OF NEW YORK, RICHARD
     PENGEL, DANIEL EHRENREICH,
7    CARLOS MATOS

8                    Defendants

9    ------------------------------x
                                     New York, N.Y.
10                                   December 13 2012
                                     11:00 a.m.
11

12   Before:

13                    HON. JOHN G. KOELTL

14                                       District Judge

15                         APPEARANCES

16   DARIUS WADIA LLC
         Attorney for Plaintiff
17   DARIUS WADIA

18   NEW YORK CITY LAW DEPARTMENT
         Attorneys for Defendants
19   MORGAN D. KUNZ
     MELISSA WACHS

20

21

22

23

24

25

CcdQwilC

1          (In open court; case called)

2          MR. WADIA:  For Mr. Jimmy Williams, Darius Wadia, 233

3     Broadway, New York, New York.  Good morning, your Honor.

4          THE COURT:  Good morning.

5          MR. KUNZ:  For defendants, Pengel, Ehrenreich and

6     Matos, Morgan Kunz.  Good morning.

7          THE COURT:  Good morning.

8          All right.  This is the defendant's motion.  I'm

9     familiar with the papers.  So, I am here to listen to argument.

10          MR. KUNZ:  Thank you, your Honor.

11          We will start by addressing the malicious prosecution

12     claim since that was briefed first.  As laid out in our motion

13     papers, we believe the claim is barred by the doctrine of

14     absolute immunity.  I can walk you through the argument in its

15     most basic form.  There is a presumption under New York State

16     law that a grand jury indictment creates probable cause.

17          Because of the witness immunity in grand jury

18     proceedings, plaintiff cannot rebut that presumption of

19     probable cause, and, therefore, there is no valid malicious

20     prosecution claim.

21          THE COURT:  There has long been an exception to that

22     claim if the indictment was procured in an improper way.  And

23     doesn't Judge Dearie's decision really come out the other way

24     from you?  Because the impact of your argument is plainly that,

25     OK, if -- taking an extreme case -- the police formulate a

CcdQwilC

fraudulent case against a defendant.  They create false

evidence outside the grand jury room.  They do false reports.

They encourage the prosecutor to bring the indictment.  The

false evidence then gets presented to the grand jury in

addition just to their testimony, and they have absolute

immunity for their testimony, but an indictment then gets

returned.  And the officers have protected themselves from

malicious prosecution because they've testified before the

grand jury even though they created false evidence, had it

presented to the grand jury, got the prosecutor to bring the

indictment, one would think there would be a lot of policemen

out there who would be begging to testify before the grand

jury.  I mean, one policeman wouldn't be enough.  They'd all

want to testify before the grand jury because this would be

their free pass.  And of course that goes way beyond the

limited Supreme Court decision, and it does seem contrary to

Judge Dearie's decision.  So ...

          MR. KUNZ:  I guess my first observation is I believe

you're referring to Judge Dearie's decision in *Sankar v. The*

*City of New York*.  That case is very distinguishable from the

present one on the simple fact that there was no grand jury

indictment in that case.  The City of New York in that case was

attempting to extend the holding in *Rehberg* to cover not the

probable cause prong of a malicious prosecution claim but the

initiation prong.  And we were saying that plaintiff could not

CcdQwilC

```
1    meet his burden in showing that the officers initiated the

2    prosecution without using the grand jury testimony for which

3    they're immune, and Judge Dearie said, no, that's one step too

4    far.  That's not what *Rehberg* is about.  The reason I think

5    that's distinguishable here is because we're focusing on the

6    probable cause prong of malicious prosecution.

7             Now, in regard to your question, I think the Supreme

8    Court actually discussed this issue in the *Rehberg*

9    decision --well, in the famous footnote two, but even beyond

10   that when they were talking about the reason why -- one of the

11   arguments against extending grand jury immunity to police

12   officers, to government officials was that there would be no

13   deterrent effect; that you needed the civil liability as a

14   deterrent effect to prevent officers from doing the exact thing

15   that you're talking about.

16            And the Supreme Court said that that interest was

17   overcome, and that it was more important -- there was a greater

18   interest in having witnesses be immune for their grand jury

19   testimony to encourage frank, honest discussions with the jury.

20            THE COURT:  But --

21            MR. KUNZ:  So I think your extreme example, which

22   obviously sounds like a very bad situation --

23            THE COURT:  Sure does.

24            MR. KUNZ:   -- the deterrent effect there is the fact

25   that the prosecution would ultimately fail.  And that police
```

CcdQwilC

```
1    officers -- this is what the Supreme Court says, police

2    officers have an interest in seeing the prosecution that they

3    initiate succeed, and, you know, prosecuting the person and the

4    fact that the prosecution will fail based on perjured testimony

5    is a sufficient --

6            THE COURT:  How do we know that?

7            MR. KUNZ:  I'm just saying this is what the Supreme

8    Court said.

9            THE COURT:  But the gist of the Supreme Court's

10   decision was we want to protect police officers who testify

11   before the grand jury because we want to have free and frank

12   testimony before the grand jury and we're prepared to live with

13   the risks of that.

14           MR. KUNZ:  Right.

15           THE COURT:  But the work outside the grand jury is not

16   covered, except to the extent that it's simply a ruse to avoid

17   the immunity for the testimony before the grand jury.  So, if

18   you say the police officers conspired to give false testimony

19   before the grand jury or they conspired to have a false

20   indictment returned, that that won't survive.

21           On the other hand, one of the things that makes this

22   case troubling, if you will, is the testimony about recreating

23   the scene, and, consequently, creating a photograph of where

24   the evidence was found, and that certainly is odd.

25           Now, the record before me is not fully developed.  I
```

CcdQwilC

say it's odd.  Perhaps police do that all the time.  You have

more experience.  You all are experts in this case.  But to

have the police take a car while it's in police custody and

then to create photographs about where they say the drugs were

as though that's a picture of where they found the drugs, which

is, of course, not really what the photograph was doing.  The

photograph was saying, OK, we've created the incident at the

station house, but a photo of the drugs there contrary to the

testimony of plaintiff certainly creates the image of creating

false evidence.

One would have thought that that's not the way in

which you do it.  One would have thought that if you take a

picture of the drugs before you take them out of the car,

that's fine.  If you have photographs of the car, and you have

photographs of the drugs, you're in a position to have people

explain to the jury subsequently "Here's the car.  Here's the

drugs.  Here's where I found the drugs" without creating a

photograph showing the drugs in the car which the plaintiff

says didn't happen.

MR. KUNZ:  Absolutely.  I understand what you're

saying, your Honor, and from an evidentiary perspective -- and

as we've laid out in our motion -- there's been no effort to

suggest that the photo was taken at the scene before the drugs

were touched at all by the officers.

THE COURT:  How do I know that on this motion?  And--

CcdQwilC

1          MR. KUNZ:  The deposition testimony of the officer

2     where he was very forthright about how he took those

3     photographs and what he did leading up to those photographs.

4     Part of it is a practical matter where officers don't have

5     digital cameras that they're running around with.  So the

6     digital camera that he used was back at the precinct.

7          THE COURT:  Does this happen all the time?  I mean,

8     this is not in the record.  This goes surely beyond the record.

9          MR. KUNZ:  I mean, honestly, I don't know that it does

10    happen all the time.  I don't know that this is a unique

11    situation.

12         I do know that it's our position that these

13    photographs are simply demonstrative of the officer's

14    testimony, and that the officer needs to testify about where

15    the drugs were found.  You know, I guess your Honor's point is

16    an interesting one.  Might it have been better had he taken a

17    photograph of the car and then the drugs separately and then

18    sort of mixed in, said, "This is what I found them."  You know,

19    I'm not sure if that would have been better or worse, and I'm

20    not sure it would change anything.  We'd still have this

21    question of fact, and the plaintiff would still be pointing to

22    the testimony of the officer and saying, "That's a lie.  When

23    he says he found the drugs there, that's a lie."

24         So this is why we put in our motion papers we think

25    that issue is a red herring, and we don't think that this is

CcdQwilC

1    really what the case turns on.

2            What the case turns on is did the officers find the

3    drugs in this spot in the car, or, as plaintiff claims, did

4    they find them in the pocket of his friend just outside the

5    car?  And as we laid out, that question is going to the jury in

6    the false arrest claim.  We'll have an answer to that question.

7    We're confident that the jury will find for the defendants in

8    that issue.

9            Our simple point is that when we're narrowing down

10   claims, and when we're deciding what's going to be put to the

11   jury, plaintiff has to prove his malicious prosecution claim

12   and the grand jury indictment creates a problem for him.

13           THE COURT:  So the case goes forward on false arrest

14   claim, right?

15           MR. KUNZ:  Correct.

16           THE COURT:  And the issue is, does it also go forward

17   on the malicious prosecution and the fair trial claim?

18           MR. KUNZ:  Correct.

19           THE COURT:  And all of the same evidence would go in,

20   right?

21           MR. KUNZ:  Right.

22           THE COURT:  So your invitation is to pretrial cut out

23   these claims and leave the issue on a narrow issue of law with

24   sort of, as you can glean from my questions, breath-taking

25   breath, leave those to the inevitable appeal rather than to ask

CcdQwilC

```
 1    these questions of the jury which has to hear the same evidence
 2    anyway?
 3               MR. KUNZ:  Well, yes, exactly, your Honor.  And I
 4    totally --
 5               THE COURT:  Why is that scenario not appealing?
 6               MR. KUNZ:  Well, there's a couple reasons.  One is we
 7    get into a problem with damages where the bulk of the
 8    plaintiff's damages are the eleven days of incarceration
 9    following his being detained pursuant to legal process.  And
10    other than that, he's got I think it's a little less than 24
11    hours in custody as his damages.
12               So, if you put both claims to the jury and assume,
13    let's say, plaintiff wins on both claims and they award damages
14    for the full eleven days, the City appeals, and then we're
15    going back, and let's say we win on appeal --
16               THE COURT:  Why don't I divide damages up?
17               MR. KUNZ:  Then you run the risk of double recovery.
18               THE COURT:  No.  Why don't I instruct the jury that
19    they can't have double recovery?  I do that all the time.  You
20    can't count damages twice.  What are your damages under this
21    claim?  What are your damages under this claim?  Because here
22    the damages are segregable, right?
23               MR. KUNZ:  That's our position, yes, is that damages
24    following the arraignment are not recoverable on the false
25    arrest claim.
```

CcdQwilC

1            THE COURT:  Right.  So you'd have damages for the

2    false arrest claim and then you'd have damages for the

3    malicious prosecution and fair trial claim.

4            MR. KUNZ:  Right.  And the malicious prosecution and

5    fair trial claim would be the same damages.

6            THE COURT:  So, that's easy.

7            MR. KUNZ:  Well, we don't think it's quite that easy,

8    and we think that any time you put two sections on the verdict

9    sheet asking the jury to award two sums, you run the risk of

10   double recovery.  And we understand that you can give limiting

11   instructions, but nevertheless we're concerned about that risk.

12           Obviously, your Honor's point here is well taken, and

13   we understand what you're saying.  I think our point is that we

14   don't think the law is -- especially under the malicious

15   prosecution issue, we don't think the law is that confusing

16   where we would put it to the jury and then let the Second

17   Circuit sort it out on appeal, or on post trial motions.

18           We think that for the malicious prosecution, the case

19   law is very clear, and other than the Judge Dearie decision are

20   the Eastern District, other judges that have looked at this,

21   and the Southern District here, Judge Scheindlin especially,

22   have held what we think is the correct holding:  That in

23   situations like this, the plaintiff cannot show that the grand

24   jury indictment was procured through the officer's fraud and,

25   therefore, the malicious prosecution claim cannot proceed.

CcdQwilC

1          I think Ms. Wachs wanted to make a few comments on the

2     fabrication of evidence.

3          THE COURT:  Can I just ask one other question?

4          MR. KUNZ:  Sure.

5          THE COURT:  I can't find, and maybe you can help me,

6     the specific allegations against Officer Matos.  On the other

7     hand, there is no motion to dismiss Officer Matos for lack of

8     any allegations of personal involvement.  So it's not something

9     I can decide on these motions because I have no motion to

10     dismiss Officer Matos.

11          MR. KUNZ:  Well, we thought of making that motion.

12     We've actually asked Mr. Wadia to consider withdrawing the

13     claims against Matos.  You know, frankly, we would orally make

14     that motion here to dismiss the claim against Matos.  We don't

15     think he is a particular player in this incident.

16          THE COURT:  I don't know.  I have no allegations

17     against him.  What was his alleged involvement?

18          MR. KUNZ:  I can let Mr. Wadia speak about that.  But

19     what Mr. Matos himself says is that the three of them were in

20     one police car together.  He was in the back seat, so he did

21     not see the traffic violations that led to the stop.  Then his

22     two partners are the ones that interacted with the people in

23     the vehicle where he stood back by the police car and just

24     watched the scene as sort of security officer.  So his

25     involvement was really just that as a watcher.  And you're

CcdQwilC

certainly right, we certainly will be moving Rule 50.  As I'm

thinking now, I think that maybe we -- I'm not sure why we did

not move to get him out, but, yes, you nailed on a particular

issue, we do intend to try to get him out at some point in the

case.

MR. WADIA:  Your Honor, I will need to think about it,

but I don't think they're going to get --

THE COURT:  Hold on a moment.  Ms. Wachs wanted to say

something.

MS. WACHS:  Briefly, toward the malicious prosecution

claim.  It moves almost parallel to malicious prosecution claim

that Mr. Kunz is describing, and I think what's happening here

is after the attempt to remove the malicious prosecution claim

from the cases made, Mr. Wadia came with a new cause of action

for this case.

THE COURT:  Right.

MS. WACHS:  And we think it's inappropriate reframing

of what truly is a false arrest cause of action.  The evidence

that he claims was fabricated where the drugs were found is the

issue of fact of this case is what the entire case is being

litigated about.  And we think when you analyze this under a

malicious abuse of process claim, it fails for two basic

reasons.  When we look at the prongs under the malicious abuse

of process, they're related by causality.  What we have here

with the forth and fifth prong is a way to sever that.

CcdQwilC

1          With the fourth, when we talk about whether or not

2     jury would be likely to alter their minds because of the

3     evidence that is being presented to them, we run up against

4     *Rehberg* itself again.  As the Court held in *Jovanovic* --

5          THE COURT:  I'm sorry, you're talking about this as a

6     malicious abuse of process.

7          MS. WACHS:  Right.

8          THE COURT:  It's usually described in the cases and in

9     the complaint as the denial of a fair trial.

10         MS. WACHS:  Right.  Or the fabrication of evidence,

11    yes.

12         What we're saying is the officer's testimony to the

13    grand jury as to where they found the drugs is going to be

14    covered by the absolute immunity confirmed by *Rehberg*, and,

15    moreover, there was no deprivation of liberty that attached to

16    the alleged fabrication of evidence itself other than the

17    deprivation that plaintiff already experienced at the time he

18    was put under arrest.  Mr. Wadia's reply papers indicates that

19    he believed the evidence to be fabricated such as it was in the

20    hours subsequent to the arrest when the plaintiff was

21    already -- when his liberty was already at question.

22         The evidence that he's talking about here is the

23    probable cause for the arrest itself.  It's not something that

24    was created.  And to the extent it he relies on the documents

25    that the police made that they would have to in the course of

CcdQwilC

1    business that indicated where the drugs are found, to the

2    extent that that's credited and every time there's an issue of

3    fact for a false arrest claim, there will be a malicious abuse

4    of process claim because of the concomitant documentation of

5    the evidence.

6          That seems absurd to us that these two claims can no

7    longer exist independently; that malicious abuse of process in

8    effect subsumes all smaller claims when this case really should

9    be tried on whether or not there was probable cause to arrest

10   the plaintiff; not what happened subsequent to that arrest.

11         THE COURT:  Why is that?  It's one thing for officers

12   to observe a crime and arrest people at the scene based upon

13   what they have seen because they have observed a crime, and

14   they have probable cause to believe that these people committed

15   a crime, and they arrest these people.

16         If in fact that's wrong, and they don't have qualified

17   immunity because they have gone way beyond the circumstances

18   that would create probable cause, and any reasonable officer

19   would know they didn't have probable cause to arrest these

20   people, but they arrested the people, that's a constitutional

21   tort.  OK.

22         You say that's the gist.  Don't worry if they then

23   engage in anything else that some would think make this worse

24   because it's always going to happen.  It doesn't always happen.

25   It does always happen that there are issues with respect to the

CcdQwilC

1      evidence that's created, for example, after the arrest.  And as

2      I was exploring with your colleague, that is different.  It has

3      a different impact.  It has a different impact on the

4      prosecution.  It's one thing for officers to say one thing.

5      It's a different thing for officers then to support the

6      credibility of their statement by allegedly creating evidence.

7              MS. WACHS:  Well, we're arguing that they weren't

8      creating evidence; that the thing that led to the arrest is

9      that nothing changed and I know that you're indicating that the

10     photographs --

11             THE COURT:  I know, but -- you know, on this motion I

12     can't -- I can't assume that.

13             MR. KUNZ:  I'm sorry, your Honor, I think like the

14     situation that you're talking about would be similar to the

15     fact pattern in I believe it's the *Ricciuti* case, where someone

16     was arrested for assault.  Subsequent to the arrest, a police

17     officer said that the person made a racially disparaging

18     comment, and that the racially disparaging comment was then

19     related to the prosecutor.  The crime was bumped up to a hate

20     crime, and the prosecution continued.  And in that case the

21     Second Circuit said, yes, you can have a fabrication of

22     evidence claim there because of the post arrest allegation that

23     he made this comment which he denies, led to an additional

24     deprivation of liberty; namely, an increase in bail and longer

25     time in custody.  So we get that.  We totally understand that.

CcdQwilC

1          Our point is that this is not that situation, and that

2     we don't believe there is anything post arrest in this case.

3     The story of the arrest, "we saw the drugs in the car," is the

4     exact same story that they took the photographs to be able to

5     show visually is what was told to the grand jury --

6          THE COURT:  No, but they're lying, right?  They

7     arrest.  After they arrest, which may or may not be a tort

8     here.  After the arrest, the plaintiff is in custody.  They all

9     go back to the station house.  Arrest is over.  They're at the

10    station house.  The allegation is that to support their

11    story -- and this may not be right; I'm just going on the

12    plaintiff's allegation -- they create the photographs in order

13    to support the prosecution.  That's plainly post arrest alleged

14    fabrication of evidence.

15         MR. KUNZ:  I think you've run into the *Jovanovic*.  As

16    Ms. Wachs cited, the *Jovanovic* issue in that case where the

17    Second Circuit said that in upholding Judge Crotty's dismissal

18    of the case said that the only avenue by which the alleged

19    fabrication could reach the jury was through the officer's

20    grand jury testimony, and since they're absolutely immune for

21    that testimony, citing to *Rehberg* and *Briscoe*, then the

22    plaintiff cannot show causation, cannot show that the officers'

23    lie caused any deprivation of liberty.  So we think that that

24    case, you know, extends and explains how the grand jury

25    immunity applies in this sort of situation.

CcdQwilC

1          THE COURT:  That's not completely true because in

2     *Jovanovic*, yes, they upheld the decision below on the lack of

3     causation based on how the evidence could have gotten to the

4     grand jury, but they distinguished a prior case that dealt with

5     a written statement which could have otherwise gotten to the

6     grand jury.  So, we have the written statements which could

7     have gotten to the grand jury.  We have the photographs which

8     could have gotten to the grand jury.

9          It's not so clear to me, and maybe you have answers

10    that certainly goes beyond this motion, that the only way the

11    photographs could have -- and this goes beyond the Supreme

12    Court case, it goes beyond *Jovanovic* -- the only way that the

13    photographs could get to the grand jury is with testimony by

14    the officers.  I would have thought that real evidence, as

15    opposed to simply demonstrative evidence, would get to the

16    grand jury without testimony by the officer.  I don't know what

17    happened.  I don't --

18          MR. KUNZ:  We actually don't either because we don't

19    have the grand jury minutes.  Mr. Wadia we believe does have

20    them.  So I don't even, frankly, know if the photographs went

21    to the grand jury.

22          THE COURT:  OK.  As I say, the Second Circuit

23    distinguished one of its prior cases which dealt with written

24    statements.

25          MR. KUNZ:  Well, I understand what you're saying

CcdQwilC

1      there.  I think that this case is more analogous to *Ricciuti*

2      than in the situation where there's a written statement

3      because, again, the only evidence that places the drugs there

4      is not a sworn affidavit from an officer.  It's the officer's

5      testimony that he gave at the grand jury.  And, you know, we've

6      talked about the photograph issue.  So we just say that.  And I

7      guess sort of the last observation I'll make --

8              THE COURT:  You know, you say you don't have the grand

9      jury minutes and the plaintiff does.  It would surely be

10     interesting -- I don't know the answer on this motion and I

11     don't know whether the grand jury minutes are producible or

12     not.  I mean, there is plainly case law on the admissibility of

13     the grand jury minutes and whether you can get the grand jury

14     minutes.  It certainly would be interesting to know whether the

15     officers -- whether the photos went to the grand jury, whether

16     the officers testified to the grand jury that these are photos

17     of where the drugs were found.

18             MR. KUNZ:  Right.

19             THE COURT:  Or we created these photographs to show

20     you, members of the grand jury, where we found the drugs, but

21     we only, recreated this.

22             MR. KUNZ:  Well, I think recreation might be a little

23     bit strong description of what actually happened.  I think it

24     was simply more practical they had -- there's three of them,

25     and they had three people under arrest, so they took them back

CcdQwilC

1    to the precinct and one of them drove the car back to the

2    precinct with the drugs in the car where they had scene them

3    and didn't dilly-dally at 4:00 a.m. on a street corner.  So I

4    don't think there was any recreation, but, you know, I

5    understand those will be questions of fact.

6        THE COURT:  Is that right?  The testimony is that the

7    officers -- one officer drove the car back with the drugs where

8    they were rather than took the drugs into safekeeping and --

9        MR. KUNZ:  I think what he said at his deposition is

10   that he secured the drugs.

11       THE COURT:  I took that to mean, you know, they drove

12   the car back, but the drugs weren't sitting in the car.  The

13   officer had the drugs, and then at the station house physically

14   put the drugs back where the officer said that they were.  But,

15   I mean, under the testimony as I recall reading it, they were

16   physically moved.  They were --

17       MR. KUNZ:  Yes, you're correct, your Honor.  You're

18   correct.  The detective says that or the officer says that he

19   did remove them at some point and put them back.

20       "At some point he returned the evidence to the vehicle

21   in which you found it, is that correct?

22       "Yes, for the purpose of taking photographs to

23   indicate where in the vehicle the evidence was recovered."

24       I mean, look, when you hear the officer tell it, he

25   just wants to be able to explain.  He's anticipating a

CcdQwilC

situation where he is going to be asked how could you possibly

have seen the drugs down on the side of the car from where you

were standing, and he wants to be able to have a photograph

saying, look, the bag is visible from my view, which is why he

took the photograph.

So, like I said, we think that's a red herring.  We

think it is simply demonstrating what he saw visibly, and he

would obviously have to testify about it.

THE COURT:  Do you have many -- again, I always rely

on the lawyers who deal with this all the time.  Do you have

many cases where the police recreate the scene and create

photographs?

MR. KUNZ:  In almost all the trials I've done, I've

gone back to the scene with the officers and point to where

things happened and take photographs of them, yes.  We do that

sometimes years after the fact.  I did a trial with Judge

Rakoff where we hired an animation specialist to recreate the

scene digitally as our officers had explained it.  So we think

this is, frankly, a common practice.  The fact that the officer

did it himself in the hours after the arrest, I don't think

really changes the analysis of what the photographs are at all.

The last thing I will say, the reason we think

*Jovanovic* is insightful in this case is because the facts of

that case are, frankly, quite similar to what we have here.

It's an officer saying that they go to a location and they see

CcdQwilC

1   evidence, candles in an apartment and then the plaintiff says,

2   "That's a lie.  He never saw candles in my apartment."  The

3   officer presents that testimony to the grand jury, and the

4   grand jury indicts.  We think there are very, very similar

5   situations and that's why we think --

6          THE COURT:  But the officers here made written

7   statements also prior to the grand jury that the plaintiff

8   alleges were false, and *Jovanovic* explicitly distinguished the

9   creation of a written statement from tolling.

10          MR. KUNZ:  I'm not sure what the written statements

11   that plaintiff is asserting they made are.

12          THE COURT:  There was, I thought, written statements

13   by the police in support of the complaint.

14          MR. KUNZ:  Well, there's an arrest report which is

15   created, and then there would have been the criminal complaint

16   drafted by the district attorney but signed by a police

17   officer; but I'm not sure if plaintiff attached those to his

18   motion, and I'm not sure if they specifically address this

19   issue of where the drugs were found.  I think they just say we

20   arrested plaintiff because he was in possession of drugs.

21          THE COURT:  Yes, but those statements were alleged to

22   be false, right?  And they're different from the grand jury

23   testimony.  Different in the sense that they're not -- the

24   officers are not entitled to absolute immunity for those --

25          MR. KUNZ:  So what some of this reminds me of is the

CcdQwilC

*Kalina* case from the Supreme Court where the Washington State

District Attorney signs an accusatory instrument that turns out

contains false information.  And the Supreme Court says that

absolute immunity does not apply to that action because it was

pre-prosecutorial.  It was a typical police action in signing

an accusatory instrument and allowed a false arrest claim to

proceed.

        So to the extent that we get into the officer's

writings, our point is that to the extent our officers are

writing down, you know, we arrested this guy because we found

him in possession of drugs, that is simply restating their

probable cause.  That is simply putting down in a record that

they can later look at to refresh their recollection about why

they arrested this guy that there was probable cause to arrest.

        We think that the malicious prosecution, denial of

fair trial claim is something different.  And we think when you

look at the Second Circuit cases that allow the denial of fair

trial claim to proceed, there's always something more.  There's

something additional that led to an additional deprivation of

liberty that caused further damages, and we don't see that

here.

        THE COURT:  Thank you.  I appreciate the arguments.

They're very thorough.

        Your turn, Mr. Wadia.

        MR. WADIA:  Thank you, your Honor.

CcdQwilC

1          I will try to address all the points Mr. Kunz brought

2     up.  But before I do that, your Honor, last night while

3     preparing for the conference, I found two other cases.  I gave

4     them to Mr. Kunz and Ms. Wachs this morning, and I would like

5     to hand them up to your Honor.

6          The first is simply another decision by Judge Dearie.

7     It's called *Jennifer Hewitt v. The City of New York*, in which

8     he distinguishes a case in which the complaint of evidence was

9     solely the testimony in the grand jury, and he distinguishes

10    that from his earlier case *Sankar* where the malicious

11    prosecution claim wasn't based on the testimony in the grand

12    jury, and I would emphasize the words "based" and "testimony."

13         And the second case is *Tabaei v. New York City Health

14    and Hospitals Corp*.  That's a case out this court, your Honor,

15    Judge Rakoff, which in a footnote -- you know, I will readily

16    admit that it's dicta in this case, but in a footnote Judge

17    Rakoff states, footnote 5:  "Defendants' more recent argument

18    that they are entitled to absolute immunity on the basis of the

19    Supreme Court's recent decision in *Rehberg* completely misreads

20    the decision.  *Rehberg* held that a defendant cannot be held

21    liable for testimony given in the grand jury.  But plaintiff

22    here does not rely on defendants' grand jury testimony in any

23    material respect."

24         Now, your Honor, without the underlying papers, I

25    agree that this is dicta.  This is not a case that may be

CcdQwilC

1  relied on as precedent.  But it's clear to me, at least, that

2  the same issue has arisen.  And what the defendants confuse

3  here is the core holding of *Rehberg*; and, that is, that a

4  malicious prosecution claim can't be based -- and I will put in

5  the word solely -- solely on the testimony of a witness in the

6  grand jury.

7          And, your Honor, to back up.  In reading cases

8  interpreting *Rehberg*, it's commonly said in the case law that

9  *Rehberg* broke no new ground.  *Rehberg* simply is an extension of

10 the Court's earlier holding in *Briscoe*.  And we don't hear the

11 defendants, we don't hear the City of New York in any other

12 cases saying that, "Well, you can't bring a malicious

13 prosecution claim because there was a trial in which the

14 officers testified because, therefore, they're immune from

15 civil prosecution because they testified in front of a petit

16 jury.  They testified at a trial."

17         They are clearly immune under *Briscoe* from action

18 brought solely on that testimony at trial.  That's a

19 distinction here.  We see that distinction I think clearly in

20 *Jovanovic*.  And in that case, the claim that Mr. *Jovanovic* was

21 denied his right to a fair trial because of testimony that the

22 lead detective gave regarding candles was rejected precisely

23 because that testimony, I think -- and I may be mistaken -- I

24 think that testimony was before the petit jury, but it may have

25 been before the grand jury, but he can't be held liable solely

CcdQwilC

1    for that testimony on that grounds

2              And when the Second Circuit was discussing a

3    videotape, which presumably the plaintiff said was fabricated

4    or improper and made prior to the case being indicted, the

5    Court rejected his argument on different grounds saying that

6    that videotape was not material.

7              And what we have here is -- if you want to talk about

8    a question of materiality.  If the drugs are in the car, if the

9    jury believes the police officers said the drugs were found in

10   the back seat of the car, then plaintiff's case fails.

11             If the jury believes that the plaintiff and his

12   witnesses are truthful and that the drugs were found on the

13   person of Mr. Alston, then the case succeeds.  So, there can't

14   be a more material issue than the one presented here.

15             I would like to talk about the photos as well since

16   they have been brought up.  I do have the grand jury testimony.

17   Originally, I didn't provide it to the people as an oversight.

18   And I thought I had then provide -- I'm sorry, not the people.

19   To the defendants as an oversight, but I thought I had

20   provided --

21             THE COURT:  I know who you were referring to.

22             MR. WADIA:  And I --

23             THE COURT:  Have you now provided them?

24             MR. WADIA:  I thought I had.  If I hadn't, I most

25   certainly will.  And I probably have them.  I probably can

CcdQwilC

1   access them on my phone, your Honor.  It might take a minute.

2           THE COURT:  It's all right.

3           MR. WADIA:  My recollection is there is absolutely no

4   testimony whatsoever about photographs.  And the significance

5   of the photographs, which I think your Honor has stated is that

6   this is an extremely unusual occurrence.  Purely anecdotally,

7   your Honor, I have been practicing criminal law for 15 plus

8   years, your Honor, and I have handled scores of drug cases, and

9   I've tried several drug cases, and I have never ever seen the

10  recreation, or whatever you want to call it, of evidence after

11  the fact.  The significance in this case is --

12          THE COURT:  Not to interrupt you, but it seems to me

13  to be different when the police do it, not under the

14  supervision of lawyers or trial lawyers who are trying to

15  plainly make a demonstration for purposes of trial, but, rather

16  soon after the events to make those photographs, they invite

17  misapprehension.

18          Go ahead.

19          MR. WADIA:  Your Honor, I agree, they invite

20  misapprehension, and I think at worst, if they are provided to

21  the district attorney to show the district attorney, to

22  demonstrate to the district attorney that these are where the

23  drugs were found or these are the drugs as we found them, then

24  that is in fact an actual fabrication of evidence in the way

25  that the defendants used that term.  They took evidence from

CcdQwilC

one place, put it in another and said "This is a fabrication of evidence."  And even if that is not the case, it supports the plaintiff's theory that the officers lied, gave false information to the prosecutor as to where they found the drugs.

Now, I don't know, your Honor, and this was -- I don't know if it was uncovered in the depositions, I don't know if the -- and even if it were, I'm sure the officer would testify that, oh, no, he told the prosecutor he put the drugs there afterward.  But the implication is that he wanted to support his false information that he provided to the prosecutor.

And that false information comes not only from the photographs but also from the arrest reports, from the criminal court complaint and from the statements that the officer made to the prosecutor.

If the officer told the prosecutor the drugs were found on the person on the coat of a person in the back seat, and nothing was found in the car, and we have no other evidence about that, the prosecutor would have declined to prosecute the case because they couldn't prove the case without the automobile presumption.  So, it is painfully clear to me that the officers told the prosecutor that they found the drugs on the back seat and not on Mr. Alston's person, and that is false information.

And in countering defendant's motion to dismiss, I have commented on their use of the term fabricated evidence, as

CcdQwilC

1   if we can proceed on a right to fair trial claim unless somehow

2   the police fabricated the evidence out of thin air.

3        I think placing evidence, even if it's telling the

4   prosecutor that the evidence was found in one place and not

5   another, and then lying in a police report and lying under

6   penalties of prosecution in a complaint is clearly fabrication

7   of evidence, and I think your Honor has so held earlier in a

8   case this year.

9        THE COURT:  Could I make something clear?  When I ask

10  questions at argument, they are not intended to in any way

11  explain any sorts of findings of fact by me or assumptions by

12  me about what the true facts are.  I appreciate that the

13  plaintiffs contentions are denied by the officers.  The

14  plaintiff says the arrest happened in one way, and the

15  defendants say it's just not true.  And by raising all these

16  types of hypotheticals about what happened or didn't happen, I

17  just don't want any one to assume that I've decided what way

18  things happened.

19       This is a case that it's plain that there are hotly

20  disputed issues of fact as to how the arrest, in fact,

21  occurred, where the drugs were, how they were seized, from

22  where, from whom, and the case -- I mean, the defendants agree

23  that the issue of false arrest at least has to go to the jury.

24  So, it is a quintessential case for the jury to decide what the

25  facts really are.  I say that now because you've been going on

CcdQwilC

for some time on your version of the case, and your proffers

about how you believe these things really happened. And these

are plainly questions of fact for the jury, and I wouldn't want

anyone to think that I have any conclusions on issues that

really have to be resolved by a jury.

MR. WADIA:  Thank you, your Honor.  And I apologize if

I implicated that I thought you did have opinions on it, but

there certainly are issues of fact that the plaintiff and the

defendant don't agree on.  I think those are -- because there

are those issues of fact, very material issues of fact, this is

why I believe that the defendant's summary judgment motion

should be denied.  There are these issues of fact.  And that's

undeniable, your Honor.

Then there are the issues of law, how to interpret

*Rehberg*.  And I think it is very clear that the plaintiff's

claims would have to be based solely on the testimony of the

witnesses in the grand jury in order for the malicious

prosecution claim to be dismissed under *Rehberg*.  I think that

is the crux of the argument.  And the footnote in *Rehberg*, it's

plaintiff's contention, supports that.

I know the defendants said, "Well, those cases, one

was a false arrest case, they weren't malicious prosecution

case," but it's very clear -- and it's also I think clear from

the case law in other circuits, including the Eleventh Circuit

out of which *Rehberg* arose, in which the Supreme Court affirmed

CcdQwilC

```
 1    the holding in Rehberg, and in Rehberg in the Eleventh Circuit
 2    the situation there was distinguished from a case almost
 3    identical to the case here where there was an allegation that
 4    officers placed drugs in the side compartment of a car and then
 5    passed that information on to prosecution.
 6            And therein lies the difference, your Honor, and the
 7    cases cited by the defendants out of the Southern District in
 8    their initial briefings, your Honor, are all distinguishable on
 9    those grounds as well.  First of all, those cases dealt with
10    whether or not the plaintiff was entitled to have the grand
11    jury minutes unsealed.  Some did, and in the cases, including
12    Judge Scheindlin's decision, the name of which escapes me for
13    the moment, but it's clear which one that is, I believe in that
14    case the plaintiff conceded the issue.
15            And in another one of the cases, it was clear that the
16    case was based solely on the testimony in the grand jury.  And
17    that's the difference here.  We are not relying on the grand
18    jury testimony.  We are not relying on the grand jury at all to
19    support our claim.
20            Now, to the extent that I might argue theoretically
21    that I can overcome probable cause because the officers -- I
22    might overcome the presumption of probable cause because the
23    officer, it's our allegation, perjured himself in the grand
24    jury, I still think that's a valid basis on which to overcome
25    the presumption of probable cause.  However, it is further
```

CcdQwilC

1    plaintiff's contention that the probable cause in this case was

2    procured by fraud and misrepresentation well prior to the grand

3    jury.  So I don't think the Court even needs to reach that

4    argument.

5         And it's for that basis that I believe the malicious

6    prosecution claim should be allowed to stand.  I am at a loss,

7    your Honor, really to understand how the right to fair trial

8    claim -- which the defendants have called by almost every other

9    name except right to fair trial claim -- I'm at a loss at how

10   *Rehberg* controls in that arena.  We are not basing our

11   arguments on the testimony of the officers in the grand jury.

12        THE COURT:  OK.  Let me ask you another question.

13        MR. WADIA:  Sure.

14        THE COURT:  Should I dismiss Officer Matos?

15        MR. WADIA:  Probably, your Honor.  I am inclined to

16   concede that Officer Matos should not be part of the case.  The

17   reason that -- if I may -- the reason that I didn't dismiss

18   him, your Honor, is that in his deposition most of the answers

19   were "I don't know; I don't remember."  And, your Honor, I

20   don't know if there will be more evidence that will implicate

21   him at a trial, but as I stand here now, I think I would be

22   inclined to dismiss Officer Matos.  I'd like to give it just a

23   bit more thought, your Honor, but that's the way I'm leading.

24        THE COURT:  OK.  I mean, if the defendants had made a

25   motion, a very simple motion to dismiss Officer Matos under

CcdQwilC

1   *Iqbal* and *Twombly* because there are no allegations in the

2   complaint against Officer Matos, that motion would have been

3   granted because there are not.

4           MR. WADIA:  Fair enough, your Honor.  I will consent

5   to that, your Honor.

6           THE COURT:  All right.  So the complaint against

7   Officer Matos is dismissed on consent.  I'm ready to decide the

8   other motions now.

9           (Pause)

10          THE COURT:  The defendants agree with that, right, the

11  complaint against Officer Matos is dismissed?

12          MR. KUNZ:  Yes, your Honor.  Thank you.

13          THE COURT:  On consent.

14          All right.  I'm prepared to decide.

15          The plaintiff Jimmy Williams brings this action

16  against New York City Police Department (NYPD) officers Richard

17  Pengel, Daniel Ehrenreich and Carlos Matos (collectively, "the

18  defendants") in their individual capacities.  The plaintiff was

19  driving a vehicle carrying two other passengers when Officer

20  Pengel and Officer Ehrenreich stopped the vehicle and recovered

21  narcotics during a subsequent search.  In this action pursuant

22  to 42 U.S.C. Section 1983, the plaintiff claims that his rights

23  under the Fourth and Fourteenth Amendments of the United States

24  Constitution were violated when he was arrested, detained,

25  strip searched, charged and prosecuted for criminal possession

CcdQwilC

1    of a controlled substance.

2            The plaintiff's first cause of action alleges

3    unreasonable search and seizure, false arrest and imprisonment,

4    and malicious prosecution.  The plaintiff has withdrawn his

5    second cause of action which was against the City of New York.

6    The plaintiff's third cause of action alleges denial of his

7    constitutional right to a fair trial.

8            The defendants now bring two motions.  The first

9    motion is a motion for partial summary judgment pursuant to

10   Rule 56 of the Federal Rules of Civil Procedure on the

11   plaintiff's malicious prosecution claim.  The second motion is

12   a motion to dismiss the plaintiff's fair trial claim for

13   failure to state a claim upon which relief can be granted

14   pursuant to Rule 12(b)(6) of the Federal Rules of Civil

15   Procedure, or, in the alternative, for summary judgment on that

16   claim pursuant to Rule 56.

17           The standard for granting summary judgment is well

18   established.  "The Court shall grant summary judgment if the

19   movant shows there is no genuine dispute as to any material

20   fact and the movant is entitled to judgment as a matter of

21   law."  Federal Rule of Civil Procedure 56(a); see also *Celotex*

22   *Corp. v. Catrett*, 477 U.S 317, 322-23 (1986);  *Gallo v.*

23   *Prudential Residential Servs., Ltd., P'ship*, 22 F.3d, 1219,

24   1223 (2d Cir. 1994).  "The trial court's task at summary

25   judgment motion stage of litigation is carefully limited to

CcdQwilC

discerning whether there are any genuine issues of material

fact to be tried, not to deciding them.  Its duty, in short, is

confined at this point to issue a finding.  It does not issue

to extend resolution.  *Gallo*, 22 F. 3d at 1224.  The moving

party bears the initial burden of "informing the district court

of a basis for its motion" and identifying the matter that "it

believes demonstrates the absence of a genuine issue of

material fact." *Celotex*, 477 U.S. at 323.  The substantive law

governing the case will identify those facts that are material

and "only disputes over facts that might affect the outcome of

the suit under the governing law will properly preclude the

settlement of *Anderson v. Limited Lobby, Inc*. 477 U.S. 242, 248

(1986).

In determining whether summary judgment is

appropriate, a Court must resolve all ambiguities and/or all

reasonable inferences against the moving party.  See *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475, U.S. 574, 587

(1986).  See also *Gallo*, 22 F.3d at 1223.  Summary judgment is

improper if there is any evidence in the record from any source

from which a reasonable inference could be drawn in favor of

the nonmoving party.  See *Chambers v. TRM Copy Centers Corp.*,

43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its

burden, the nonmoving party must produce evidence in the record

and "may not rely simply on conclusory statements or on

contentions that the affidavits supporting the motion are not

CcdQwilC

credible ..." *Ying Jing Gan v. City of New York*, 996 F.2d 522,

532 (2d Cir. 1993).  See also *Scotto v. Almenas*, 143 F.3d 105,

114-15 (2d Cir. 1998) (collecting cases).

In deciding a motion to dismiss pursuant to Rule

12(b)(6), the allegations in the complaint are accepted as true

and all reasonable inferences must be drawn in the plaintiff's

favor.  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191

(2d Cir. 2007).  The Court's function on a motion to dismiss is

"not to weigh the evidence that might be presented at a trial

but merely to determine whether the complaint itself is legally

sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.

1985).  The Court should not dismiss the complaint if the

plaintiff has stated "enough facts to state a claim to relief

that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the Court

to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 622,

678 (2009).  While the Court should construe the factual

allegations in the light most favorable to the plaintiff, "the

tenet that a Court must accept as true all of the allegations

contained in the complaint is inapplicable to legal

conclusions." *Id.*.

When presented with a motion to dismiss pursuant to

Rule 12(b)(6), the Court may consider documents that are

CcdQwilC

referenced in the complaint, documents that the plaintiff

relied on in bringing suit, and that are either in the

plaintiff's possession or that the plaintiff knew of when

bringing suit, or matters of which judicial notice may be

taken.  See *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776,

(2d Cir. 2002);  *Chambers v. Time Warner, Inc.*, 282 F.3d 147,

153, (2d Cir. 2002).

        The following facts are accepted as true for the

purposes of these motions, unless otherwise indicated:

        On April 10, 2009 at approximately 5:30 a.m., the

plaintiff was parked in a Land Rover near the corner of Leno

Avenue and West 128th Street in Manhattan.  Larry Alston and

Reginald Stephenson were also in the car with the plaintiff.

An unmarked police vehicle pulled up behind the Land Rover.

Officer Penel ordered Alston, Stephenson and the plaintiff to

exit the car, which they did.  At some point during the ensuing

search, Officer Ehrenreich recovered crack cocaine and heroin.

Alston, Stephenson and the plaintiff were placed under arrest

and transported to the 32nd Precinct.

        The items seized an their locations at the time of

seizure were in dispute.  The defendants maintain that Officer

Ehrenreich recovered "14 bags of crack cocaine and 31 glassines

of heroin from the floor behind the passenger seat of the car,"

that Officer Pengel recovered crack cocaine from Stephenson's

jacket pocket, and that Officer Pengel recovered $583 from the

CcdQwilC

plaintiff's person and $233 from the driver's side door.  (The

Felony Complaint at 1-2.)  By contrast, the plaintiff alleges

that Officer Ehrenreich recovered crack cocaine and heroin

concealed on Alston's person when he searched Alston on the

street.  (Amended complaint paragraph 18), and that no drugs or

other contraband were found on the plaintiff's person or in the

Land Rover.  (Amended complaint paragraph 19).

        At the precinct, the plaintiff was subjected to a

strip search in front of Officer Pengel and another police

officer.  (Amended complaint paragraph 21.)  The plaintiff

alleges that he authorized a police search of the Land Rover

but that the police found nothing during their search.

(Amended complaint paragraph 22).  The plaintiff alleges that

after his arrest, in the precinct garage, Officer Ehrenreich

placed the narcotics in the Land Rover and photographed them.

(Amended complaint paragraph 24).  These photographs were

provided to the New York County District Attorney's office.

(Amended complaint paragraph 25).  The defendants maintain that

Officer Ehrenreich, when photographing the evidence returned

the narcotics to their initial location on the floorboard of

the vehicle to recreate the view of where in the vehicle the

evidence was recovered from.  (Ehrenreich deposition at 68.)

By contrast, the plaintiff alleges that Officer Ehrenreich,

when photographing the evidence, placed the narcotics he

recovered from Alston's person on the back seat of the Land

CcdQwilC

1    Rover.   (Amended complaint paragraph 24.)

2              On April 11, 2009, the plaintiff was arraigned on a

3    felony complaint charging him with criminal possession of a

4    controlled substance in the third degree.   (Amended complaint

5    paragraph 26.)   In that felony complaint, Officer Pengel stated

6    that he observed Officer Ehrenreich recover "14 bags of crack

7    cocaine and 31 glassines of heroin from the floor behind the

8    passenger seat of the car which... Williams was driving and in

9    which ...Alston and Stephenson were passengers."   (Felony

10   complaint at 1.)

11             The New York County District Attorney's office

12   initiated prosecution of the plaintiff and presented the case

13   against him to a grand jury.   (Amended complaint paragraph 28.)

14   Bail was set at the plaintiff's arraignment.   (Amended

15   complaint paragraph 31), and the plaintiff on, unable to have

16   bail posted immediately, remained in custody until

17   approximately April 21, 2009.   (Amended complaint paragraph

18   32.)   Sometime after his arraignment, the grand jury voted to

19   indict the plaintiff for criminal possession of controlled

20   substance in the third degree and criminal possession of a

21   controlled substance in the fifth degree.   (Amended complaint

22   paragraph 33.)   The plaintiff was arraigned on the indictment

23   on May 20, 2009, and was detained until he could post bail the

24   following day.   (Amended complaint paragraph 34.)

25             On January 11, 2010, Alston pleaded guilty to

CcdQwilC

criminal possession of a controlled substance in the third

degree.  (Amended complaint paragraph 35.)  During his

allocution, Alston swore that the drugs were solely his.  The

substance didn't have anything to do with his co-defendants and

it wasn't theirs at all.  (Amended complaint paragraph 35) and

(Alston plea allocution at 13).  In addition, Stephenson

pleaded guilty to criminal possession of a controlled substance

in the seventh degree for the drugs that were discovered

concealed on his body during a strip search at the precinct.

(Amended complaint paragraph 36.)

        On February 17, 2010, The court granted a motion by

the district attorney to dismiss all of the charges against the

plaintiff.  (Amended complaint paragraph 37).

        Complaint does not contain any specific factual

allegations against defendant Carlos Matos and the parties have

consented that the complaint against Officer Matos should be

dismissed.  Therefore, the complaint against Officer Matos is

dismissed, which leaves the issues with respect to the

remaining two defendants.

        The plaintiff's first cause of action alleges

unreasonable search and seizure, false arrest and imprisonment,

and malicious prosecution.  The defendants now move for partial

summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure, on the plaintiff's malicious prosecution

claim.

CcdQwilC

1        To sustain a Section 1983 claim based on malicious

2   prosecution, a plaintiff must demonstrate a seizure amounting

3   to a Fourth Amendment violation and establish the elements of a

4   malicious prosecution claim under state law.  See *Manganiello*

5   *v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010).  See

6   also *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997).

7        In New York, to establish a claim for malicious

8   prosecution, the plaintiff must show:  "(1) the initiation or

9   continuation of criminal proceedings against plaintiff; (2)

10  Termination of the proceeding in plaintiff's favor; (3) lack of

11  probable cause for commencing the proceeding; and (4) actual

12  malice as a motivation for defendant's actions." *Manganiello*,

13  612 F.3d at 161 (citations and internal quotation marks

14  omitted.)  See also *Spencer v. Ellsworth*, No. 09 Civ. 3773,

15  2011 WL 1775963, at *4 (S.D.N.Y. May 10, 2011).

16       "The existence of probable cause is a complete defense

17  to a claim of malicious prosecution ... and indictment by a

18  grand jury creates a presumption of probable cause..." *Savino*

19  *v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).  (Citing

20  *Colon v. City of New York*, 455 N.E. 2d 1248, 1250 (N.Y. 1983);

21  see also *Donnelly v. Morace*, 556 N.Y.S. 2d 605, 606 (App. Div.

22  1990)."  ("A presumption that there was probable cause for the

23  prosecution ... exists when the plaintiff was indicted or

24  arrested by warrant.")  (Citations omitted) *Rothstein v.*

25  *Carriere*, 373 F.3d 275, 282-83 (2d Cir. 2004).  "The

CcdQwilC

presumption may be overcome only by evidence establishing that
the police witnesses have not made a complete and full
statement of facts either to the grand jury or to the district
attorney, that they have misrepresented or falsified evidence,
that they have withheld evidence or otherwise acted in bad
faith." *Rothstein*, 373 F.3d at 283 (Quoting *Colon*.  455 N.E.2d
at 1250-51) (internal quotation marks omitted).  See also
*Alcantara v. City of New York*, 646 F. Supp. 2d 449, 460
(S.D.N.Y. 2009).  "Thus, in order for a plaintiff to succeed in
a malicious prosecution claim after having been indicted, 'he
must establish that the indictment was produced by fraud,
perjury, the suppression of evidence or other police conduct
undertaken in bad faith.'"  *Rothstein*, 373 F.3d at 283 (quoting
*Colon*, 455 N.E.2d at 1251).  The plaintiff must "establish what
occurred in the grand jury, and... further establish that those
circumstances warrant a finding of misconduct sufficient to
erode the premise that the grand jury acts judicially." *Id.* at
284 (citations and internal quotations marks omitted).  See
also *Spencer*, 2011 WL 1775963 at *4.

In this case, the defendants argue that the
plaintiff's malicious prosecution claim must be dismissed
because the plaintiff was indicted and there is a resulting
presumption that probable cause existed to prosecute the
plaintiff.  Citing *Rehberg v. Paulk*, 132 S.Ct. 1497 (2012),
they further argue that the plaintiff cannot overcome the

CcdQwilC

presumption of probable cause because "a grand jury witness has
absolute immunity from any Section 1983 claim based on the
witness' testimony." *Id.* at 1506.  According to the defendants,
the courts in this circuit have uniformly held that where a
plaintiff is indicted, there can be no malicious prosecution
claim.

However, the defendants' arguments go beyond the
specific holdings of *Rehberg* and *Jovanovic v. City of New York*,
10 Civ. 4398, 2012 WL 2337171.  (2d Cir. June 20, 2012).  The
*Rehberg* Court itself noted:

"Of course, we do not suggest that absolute immunity
extends to all activity that a witness conducts outside of the
grand jury room.  For example, we have accorded only qualified
immunity to law enforcement officials who falsify affidavits,
and fabricate evidence concerning an unsolved crime." *Rehberg*,
132 S. Ct. at 1507 n. 1 (citations omitted).  Courts in this
circuit have allowed malicious action to proceed against an
officer who swore out a criminal complaint.  See, for example*,*
*Sankar v. City of New York*, 07 Civ. 4726, 2012 WL 1116984
(E.D.N.Y. Mar. 30, 2012.)  In *Sankar*, the defendant's liability
for malicious prosecution was not based on his grand jury
testimony but on his other conduct "laying the ground work for
an indictment,." and, therefore, the Court found that the
defendants signing sworn criminal complaint was a sufficient
basis for a malicious prosecution claim.  *Sankar v. City of New*

CcdQwilC

*York*, 07 Civ. 4726, 2012 WL 2923236, at *3 (E.D.N.Y. July 18, 2012).

Moreover, the *Sankar* court specifically held that *Rehberg* was inapplicable to the facts of that case.  "*Rehberg* did not alter controlling Second Circuit (and New York) law that an officer's filing of a sworn complaint is sufficient to satisfy the initiation prong of a malicious prosecution claim." *Id*.  "If anything, *Rehberg* reinforces the distinction between one who simply testifies at a grand jury... and one... who 'sets the wheels of government in motion by instigating a legal action.'" *Id.* (citations omitted).

The *Sankar* defendants, like the defendants in this case "attempted to convert grand jury testimony into an all-purpose shield from malicious prosecution liability." but the *Sankar* Court found their argument to be unpersuasive because "the adoption of such a broad interpretation of *Rehberg* would allow any police officer -- regardless of the extent of their involvement in laying the groundwork for an indictment -- to escape liability merely by securing an appearance before a grand jury." *Id.*

Here, the plaintiff's allegations of police misconduct are not limited to defendants' grand jury testimony.  The plaintiff also alleges that the defendants additionally provided false information in the felony complaint; namely, that the narcotics in question were recovered from inside the

CcdQwilC

car.  (Amended complaint paragraphs 27-30).  The plaintiff also
alleges that Officer Ehrenreich placed the drugs in the back
seat of the Land Rover after the Land Rover was brought to the
precinct and then provided those photographs to the New York
County District Attorney's office.  (Amended complaint
paragraphs 24-25).  The defendants' liability for malicious
prosecution is not based solely on the grand jury testimony but
on the other conduct of the defendants "laying the groundwork
for an indictment." *Sankar*, 2012 WL 2923236, at *3.  There
remains a genuine issue of material fact as to the location of
the drugs at the time of the seizure and whether the defendants
lacked probable cause to pursue a prosecution of the plaintiff.
Therefore, the defendants' motion for partial summary judgment
on the plaintiff's malicious prosecution claim is denied.

        The plaintiff's third cause of action alleges the
denial of his constitutional right to a fair trial.  The
defendants now move to dismiss the plaintiff's fair trial claim
for failure to state a claim upon which relief can be granted
pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure, or, in the alternative, for summary judgment on that
claim pursuant to Rule 56.

        "Pursuant to Section 1983 and prevailing case law,
denial of a right to a fair trial is a separate and distinct
cause of action." *Nibbs v. City of New York*, 800 F. Supp. 2d
574, 575 (S.D.N.Y. 2011).  See generally *Ricciuti v. N.Y.C.*

CcdQwilC

*Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).  A plaintiff

may state a Section 1983 fair trial claim by pleading that the

defendants fabricated evidence and forwarded it to the

prosecutors and that the fabricated evidence was "likely to

influence a jury's decision." *Ricciuti*, 124 F.3d at 130.

"Courts in this District have regularly found *Ricciuti* to stand

for the proposition that a claim for denial of a right to a

fair trial may be brought alongside one for malicious

prosecution even where both are supported by the same

evidence." *Nibbs*, 800 F. Supp. 2d at 576 (collected cases).

Moreover, a Section 1983 fair trial claim does not require that

a plaintiff actually go to trial; in *Ricciuti* itself, the

charges against the plaintiff were dismissed before trial.  See

*Ricciuti*, 124 F.3d at 127; see also *Douglas v. City of New

York*, 595 F. Supp. 2d 333, 346, (S.D.N.Y. 2009)  ("The Second

Circuit is permitted a claim under Section 1983 for violation

of the right to a fair trial to proceed even where no trial

took place.")  The issue is whether the plaintiff has pleaded

sufficient facts to state a Section 1983 fair trial claim.

In this case, the plaintiff asserts that the

defendants forwarded to the prosecution false information about

the location of the drugs at the time of seizure, and that the

prosecution relied on this issue when presenting the case

against the plaintiff to the grand jury.  Accepting the

allegations in the amended complaint as true, for the purposes

CcdQwilC

1    of this motion to dismiss, the plaintiff has pleaded sufficient

2    facts to state a Section 1983 fair trial claim.  The plaintiff

3    alleges that Officer Ehrenreich recovered crack cocaine and

4    heroin concealed on Alston's person when he searched Alston on

5    the street (Amended complaint paragraph 18), and that no drugs

6    or ora other contraband were found on the plaintiff's person or

7    in the Land Rover (Amended complaint paragraph 19).  The

8    plaintiff then alleges that Officer Ehrenreich, when

9    photographing the evidence, placed the narcotics he recovered

10   from Alston's person on the back seat of the Land Rover

11   (Amended complaint paragraph 24), and that these photographs

12   were provided to the New York County District Attorney's office

13   (Amended complaint paragraph 25).

14          The Plaintiff also alleges that the defendants

15   provided false information in the felony complaint; namely,

16   that the narcotics in question were recovered from inside the

17   car, and that the prosecution relied on this information when

18   presenting the case against the plaintiff to the grand jury

19   (Amended complaint paragraph 27-30).  In this way, the

20   plaintiff has adequately pleaded that the defendants fabricated

21   evidence and forwarded it to the prosecutors, and that the

22   fabricated evidence was "likely to influence a jury's

23   decision." *Ricciuti*, 124 F.3d at 130.  Although the defendants

24   against cite *Rehberg* to support their arguments that they have

25   absolute immunity for the grand jury testimony, these arguments

CcdQwilC

1    go far beyond the holding of *Rehberg* and the courts in the

2    Second Circuit that have considered *Rehberg*.  The defendants

3    rely on *Jovanovic*, but *Jovanovic* does not go as far as the

4    defendants suggest.  The basis for the alleged denial of a fair

5    trial claim in *Jovanovic* was a claim that a police detective

6    lied when he said that corroborative evidence was removed from

7    the plaintiff's apartment between the time of the arrest and

8    the execution of a search warrant.  The Court of Appeals found

9    that there was no causation because the only means by which the

10   lie could reach the grand jury was through the detective's

11   testimony, which was absolutely privileged under *Rehberg*.

12   *Jovanovic* 2120 WL 2331171 at *2.  However, the Court

13   distinguished one of its prior cases where the statement at

14   issue was a written statement.  In this case, in addition to

15   grand jury testimony, there was the written felony complaint

16   and the alleged fabrication of physical evidence; namely, the

17   photograph.

18        Because the plaintiff has indeed alleged sufficient

19   facts to support a Section 1983 fair trial claim, the

20   defendants' motion to dismiss, or, in the alternative, a

21   summary judgment is denied.

22        The Court has considered all of the arguments of the

23   parties.  To the extent not specifically addressed above, the

24   remaining arguments are either moot or without merit.  For the

25   foregoing reasons, the defendants' motions are denied except

CcdQwilC

1   that the complaint against Officer Matos is dismissed on

2   consent.

3            The clerk is directed to close Docket Nos. 22 and 36.

4            So ordered.

5            All right.  Discovery is complete.  Yes?

6            MR. KUNZ:  Yes, your Honor.

7            THE COURT:  So, the final pretrial order, requests to

8   charge, voir dire, motions in limine due January 11.

9   Responses, objections due January 18.  Ready for trial 48 hours

10  notice?  Yes?

11           MR. WADIA:  Your Honor, just on the dates, I'm

12  wondering if we can have -- most of this was already done.  The

13  joint pretrial order is done and motions in limine were done,

14  but because of my schedule, the first week of January is just a

15  little inconvenient.  Obviously, if your Honor orders it, I'll

16  have it done, but I'd rather a little more time.

17           THE COURT:  Fine.  I am sure the defendants will join

18  in that.  Yes?

19           MS. WACHS:  Yes, your Honor.

20           THE COURT:  How about January 25.  Is that good?

21  Joint pretrial, request to charge, voir dire.

22           MR. WADIA:  Yes.

23           THE COURT:  Motions in limine, responses, objections,

24  February 1.  Ready trial 48 hours notice February 21.  And I

25  will slot in at some point a final pretrial conference when I

CcdQwilC

```
 1    get a better sense of when we will be going forward close to

 2    February 21.  Right now it looks like I have a longer civil

 3    case that is going on at that time, but at least you will be

 4    ready by February 21.  If there are any conflicts you have, you

 5    can bring them to my attention.

 6              Does it make any sense to go to the magistrate judge

 7    to talk about the possibility of settlement at this point?

 8              MR. WADIA:  Your Honor, plaintiff has always been

 9    amenable to that.  Just going back, I would add that we have

10    already completed the joint pretrial order and motions in

11    limine.  Obviously, giving us this time, I don't know that

12    there will be anything else, but I just wanted to put that on

13    the table that that has been done and decided.

14              THE COURT:  I'm sorry?

15              MR. WADIA:  The joint pretrial order and the motions

16    in limine were already done.

17              THE COURT:  Submitted?

18              MR. WADIA:  Submitted decided by your Honor.

19              THE COURT:  OK.

20              MR. WADIA:  Obviously, I am not suggesting that we

21    shouldn't be allowed to bring anything else up.  I just didn't

22    know if your Honor remembered that because these motions arose

23    out of the motions in limine.

24              THE COURT:  OK.  Thank you.  So do you want me to

25    shorten the schedule?
```

CcdQwilC

1          MR. WADIA:  No.  Thank you, your Honor.

2          THE COURT:  No.  I was serious about that.

3          MR. WADIA:  No thank you.

4          THE COURT:  The schedule is good?

5          MR. WADIA:  The schedule is great with me, your Honor.

6          THE COURT:  All right.  The plaintiffs are willing to

7     talk to the magistrate judge.  You know, I'm perfectly happy to

8     send you to the magistrate judge for the possibility of

9     settlement.

10          MR. KUNZ:  I don't think there is a possibility in

11     this case, your Honor.

12          THE COURT:  All right.

13          MR. KUNZ:  There was at some point, but at this point

14     my office is no pay on the case.

15          THE COURT:  OK.  I take your statement seriously, and

16     I'm not going to make you go through a fruitless exercise just

17     to use up all of your time.  I would suggest to the plaintiff

18     that you make a demand on the defendant.  The defendant

19     obviously has an obligation to take that back to client and

20     give you a response.  So please make a demand.

21          If there is any reason that you see as a result of

22     that that you should talk to the magistrate judge, I'll send

23     you to the magistrate judge; but if the City's position is

24     still no pay, they're familiar with all of the testimony, it's

25     plainly issues of fact.  You've all heard the testimony.  So

CcdQwilC

1    just write me a letter.  And I normally send cases where the

2    parties tell me that there is any possibility, but I am not

3    going to send you if I am told by one side in good faith that

4    there is no possibility.  So you can test the waters.  If you

5    sense any possibility, just let me know.

6              MR. WADIA:  Your Honor, we previously long ago made a

7    demand and there has never been an offer.  So, if anything, I

8    would increase that demand, but I'm willing obviously to stand

9    by it at this point.  So I don't see the necessity to make --

10   if I made a new demand, it would be in a higher amount, let's

11   put it that way, your Honor.

12             THE COURT:  Go ahead.  You can conduct settlement

13   negotiations between the two of you in any way you want.

14             MR. WADIA:  I understand.

15             THE COURT:  I think realistically at this point your

16   demands are going up.  That may or may not cause the decision

17   makers on the defendant's side to say, oh, well, we've got to

18   look at this again.  The demand is going up.  Why is the demand

19   going up?

20             On the other hand, that might be unrealistic.  I don't

21   know.  I do not get in the middle of settlement discussions.

22   If there is any willingness by the parties to consider any

23   reasonable settlement, I will send you to the magistrate judge.

24   Other than that, I'm here to try cases.  So I will see you for

25   trial.

CcdQwilC

1          When all of the motions are finally decided, as you

2     all know, is a time where people usually get serious in the

3     sense that posturing makes no sense because you know that

4     you're going to go to trial soon.  So notions like "It's

5     important to maintain a strong position" or "we don't want to

6     show weakness" are really quite irrelevant because you know a

7     jury will answer these questions.  And someone is not right.

8          The plaintiff says "I made a demand.  All the motions

9     have been decided.  We're fairly close to trial," it might just

10    end going up.  If I made a demand now, it's going up.

11         The defendant says, "My office says this case is no

12    pay."  OK.  So we have a defendant who says the chances we will

13    lose and pay any money are zero.  We're not willing to pay

14    anything on this case.  So we will spend the money to go to

15    trial and use the services of two lawyers of our office at

16    least and spend that money out of public funds defending the

17    case, and we are confident that the result will be we don't

18    have to pay anything.  If we had to pay something, we would put

19    that on the table because there's no reason not to.

20         The plaintiff says we have a demand.  We made a

21    demand.  Our demand has gone up.  We have a reasonable degree

22    of confidence that we will collect a reasonable amount of

23    money.  It doesn't have to be a huge amount of money because

24    they're bargaining against zero on the other side, but we're

25    confident that we'll recover.

CcdQwilC

1          Each of you has clients.  The defendant has people who

2   make these decisions and who get judged on their ability to

3   make these decisions and make these calculations.  Then the

4   case will be tried to the jury, and the jury will come out a

5   with verdict, and the verdict will be what it is, and one of

6   you will undoubtedly be wrong.  And then you will have to live

7   with that.

8          The plaintiff has a client.  Defendant has trial

9   counsel, as well as an obligation to consult with the people

10  who make the settlement decisions.  And someone will be wrong.

11  The reason that cases often settle is that people appreciate

12  that they are not infallible, and that it is just possible that

13  they could be wrong.  And so cases settle because people say,

14  here are our risks and here are the chances, and having

15  assessed what the potential recovery or liability is looking at

16  the risks, we value this case for a certain amount.  And, as I

17  say, one side has made the calculations very wrongly.  And the

18  jury will eventually decide who that is unless you all decide

19  to settle it before that.

20         As I say, there are no tactical reasons, concerns,

21  whatever at this point.  It comes down to shear calculations.

22  So plaintiff should make a demand.  Then they have to take it

23  to the powers that be.  I don't get involved in settlement

24  discussions.  I don't get involved in the back-and-forth.  If

25  you need someone to do it, the magistrate judge will do it.  As

CcdQwilC

1    I've also said, I am here to try the case, and so I will.

2          OK.  Anything else from me?

3          MR. WADIA:  No.

4          THE COURT:  Thank you.

5          I appreciated very much the briefing and the

6    arguments.  If the case goes to trial, I look forward to having

7    you all try it.

8          (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25